UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| RACHEAL GANTT, } | |
|    Plaintiff, } | |
| v. } | Case No.: 2:23-CV-648-RDP |
| DEPUTY MONICA EVERETT, } | |
|    Defendant. } | |

### MEMORANDUM OPINION

This matter is before the court on Defendant Deputy Monica Everett's Motion for Summary Judgment. (Doc. # 34). The Motion has been fully briefed and is ripe for review. (Docs. # 36, 41, 43). For the reasons discussed below, the Motion (Doc. # 34) is due to be granted in part and denied in part.

**I.     Factual Background**

On or around February 4, 2023, Plaintiff Racheal Gantt was arrested, transported to the Jefferson County Jail, and booked as a pretrial detainee. (Doc. # 1 ¶¶ 6-7). All female inmates at the jail are housed on the fifth floor. (Doc. # 35-3 at 5). The fifth floor has seven total "blocks," each identified by a different letter from "A" to "G." (*Id.* at 38).

Within a few days of being at the jail, Plaintiff disclosed to a mental health worker that she was thinking of harming herself and was placed on suicide watch. (Docs. # 1 ¶ 11; 35-4 at 29-30). As a result, Plaintiff was transferred to "A Block," one of the blocks on the fifth floor designated for prisoners who pose a suicide risk. (Docs. # 1 ¶ 12; 35-3 at 8). The facility's A Block contains two stories of cells that open to a common area referred to as the "day space." (Docs. # 35-3 at 8; 35-4 at 16). For safety reasons, inmates on suicide watch are traditionally housed in a cell by themselves on the bottom level of A Block, although occasionally they may

be housed on the top level as well. (Doc. # 35-3 at 8). Plaintiff was placed in Cell A11, which was on the bottom level. (*Id.* at 9). In addition, because Plaintiff was on suicide watch, she had her uniform taken and was issued a "suicide smock" – a green, thick Velcro blanket worn as clothes so that an inmate cannot rip or tear it to hang herself. (*Id.*).

On February 8, 2023, Deputy Niyasmine Morgan and Deputy Jamie Yunker were the two deputies assigned to the jail's fifth floor for the morning shift. (Doc. # 35-6 at 5). In addition, Control Room Operator Jamesanna Lovell ("CRO Lovell") was stationed as the control room operator ("CRO") on that floor. (Doc. # 35-5 at 4-5). The control room, which is located at the center of the fifth floor with glass windows overlooking each block, houses a large computer that can remotely lock and unlock each individual cell door. (Docs. # 35-4 at 19; 35-3 at 7). When a cell door is unlocked from the control room, it automatically swings open in the block. (Doc. # 35-4 at 25). Because the control room has an intercom system that connects to each block, deputies can verbally request a certain cell door be unlocked while stationed in a particular block and the CRO can remotely open it. (*Id.* at 9). Alternatively, deputies can travel between the individual blocks and the control room by walking through a sliding glass door and down a hallway. (*Id.* at 19-20; Doc. # 35-3 at 21).

Defendant Deputy Monica Everett ("Everett") was assigned duties on the first floor of the jail on the morning of February 8, 2023. (*Id.* at 10-11). Around mid-morning, Everett was ordered to go up to the fifth floor to assist Deputies Morgan and Yunker with a shakedown in F Block. (*Id.* at 12). During the shakedown, Everett and Deputy Jasmine McCants were instructed to escort one of the female inmates in F Block to an individual cell in A Block. (*Id.* at 13).

When Everett and Deputy McCants entered A Block, Everett heard Plaintiff "screaming and crying hysterically" from her cell. (*Id.* at 14). Everett, who had never met Plaintiff before

2

this point, walked over to Plaintiff's cell and asked her what was wrong. (*Id.*; Doc. # 35-1 at 13:56:04-13:56:16). Plaintiff responded that she had hit her head.[1] (Doc. # 35-3 at 14). Everett asked to see Plaintiff's head; although she saw no bleeding, she saw a large knot on the side of her head. (*Id.*). In addition, Everett noticed that Plaintiff had a suicide smock instead of a uniform, and realized at this point that she was on suicide watch. (*Id.* at 10). The video evidence shows that Plaintiff was not actually wearing her suicide smock but was naked when the events giving rise to this matter transpired. (Doc. # 35-2). Therefore, although Everett testified that she noticed Plaintiff "wearing" a suicide smock, the court infers from the undisputed Rule 56 evidence that Everett actually noticed that Plaintiff had a suicide smock present with her in her cell.

Everett left Plaintiff in her cell and walked from A Block to the control room to contact the jail nurse and inform her of Plaintiff's head injury. (*Id.* at 19). The nurse instructed Everett to bring Plaintiff down to the third level. (*Id.*). A few other officers, including CRO Lovell and Deputy Yunker, were present in the control room during this interaction. (*Id.*; Doc. # 35-6 at 6). Everett asked one of the officers to grab Plaintiff a uniform to wear while she was being transported. (Doc. # 35-3 at 19). She then unlocked the door to Plaintiff's cell from the computer in the control room, before heading down the hallway to A Block to retrieve her. (*Id.* at 20; Doc. # 35-1 at 14:00:43). No deputies were present in A Block when Everett unlocked Plaintiff's cell door. (Doc. # 35-1 at 14:00:43).

---

[1] The parties dispute how Plaintiff told Everett that she had injured herself. Everett testified that Plaintiff told her she injured her head by falling and hitting it on the toilet. (Doc. # 35-3 at 14). CRO Lovell testified that Everett told her the same when she came into the control room to call the nurse. (Doc. # 35-5 at 8). But, according to Deputy Morgan, Everett told her she was taking Plaintiff to the nurse because she had been hitting her head against the wall of her cell. (Doc. # 35-4 at 16). And, the reports from the emergency room and the paramedics say that Plaintiff's head injuries came from "[b]anging head against wall." (Docs. # 39-3 at 2; 39-4 at 2).

3

When her cell door unlocked and swung open, Plaintiff immediately sprinted out of her cell and across the day space toward a set of stairs leading to the upper level of A Block. (Docs. # 35-3 at 21; 35-1 at 14:00:50-14:01-00). As Everett entered A Block, she saw Plaintiff run in front of her and up the stairs. (Docs. # 35-3 at 21; 35-1 at 14:01:02). Everett instructed her to come back down; however, Plaintiff ignored the order. (Doc. # 35-3 at 21-22). Everett then realized that Plaintiff had her hand on the second story railing and was planning to jump. (*Id.* at 22). Everett ran up the stairs and attempted to grab Plaintiff from the railing, but before she could do so, Plaintiff jumped from the balcony and landed at the bottom level of the day space. (*Id.*; Doc. # 35-1 at 14:01:02-14:01:06). A total of 23 seconds elapsed from the time Plaintiff's cell door was unlocked until the time she jumped from the second level railing. (Doc. # 35-1 at 14:00:43-14:01:06).

Other deputies saw Plaintiff jump from afar and issued a "Code White," the jail's signal for a medical emergency. (Doc. # 35-3 at 26). While the deputies were waiting on the paramedics to arrive on the scene after Plaintiff's suicide attempt, a deputy emerged from Plaintiff's cell holding her suicide smock and used it to cover Plaintiff's body. (Doc. # 35-1 at 14:03:06-14:03:15). Birmingham Fire and Rescue arrived on the scene and transported Plaintiff from the jail to the emergency room, where she was treated for ankle fractures from her jump as well as the injury to her head. (*Id.* at 26-27; Doc. # 39-10 at 2). Plaintiff was released from the custody of the Jefferson County Jail after this incident. (Doc. # 35-3 at 31).

Plaintiff filed the current action on May 22, 2023. (Doc. # 1). The Complaint asserts a single cause of action against Everett under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983. (*Id.*).

4

## II. Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if … there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id*. at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id*. at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. *See Anderson*, 477

U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Although the court must resolve all reasonable doubts in favor of the non-movant, this does not mean the court cannot rely on objective videotape evidence. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Thus, if a videotape clearly depicts events and leaves no material factual disputes, the "view[s] the facts in the light depicted by the videotape." *Id.* at 380-81.

**III.   Discussion**

On January 18, 2024, Everett filed a Motion for Summary Judgment. (Doc. # 34). In the Motion, Everett argues that summary judgment in her favor is proper because she is entitled to qualified immunity. In addition, she argues that she is entitled to summary judgment on Plaintiff's request for injunctive relief. The court examines both arguments, below.

### A. Qualified Immunity Analysis

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The court determines whether a defendant is entitled to qualified immunity by engaging in a three-step analysis. *See Skop v. City of Atlanta*, 485 F.3d 1130, 1136-37 (11th Cir. 2007). The initial burden is on the official claiming qualified immunity to establish that she was acting within her discretionary authority. *Id.* at 1136. When the plaintiff does not dispute the defendant was operating within her discretionary authority (and that is the case here), the burden shifts to the plaintiff to show that the "defendant's conduct violated a statutory or constitutional right," *id.* at 1137 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)), which was "clearly established" at the time of the alleged violation. *Id.* If the plaintiff cannot satisfy both prongs, the defendant is entitled to qualified immunity. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004).

Because the parties do not dispute that Everett was acting in her discretionary authority at the time of Plaintiff's attempted suicide, the burden shifts to Plaintiff to prove that Everett violated one of her constitutional rights and that the constitutional right was clearly established at the time of the violation. Everett argues that she is entitled to summary judgment because Plaintiff cannot satisfy either requirement. That is, she argues that (1) Plaintiff cannot show that any violation of a constitutional right occurred, and (2) even if she could, Plaintiff cannot show that the constitutional right at issue was clearly established. (Doc. # 36 at 9). The court examines each argument, in turn, below.

### 1.     Whether Everett Violated a Constitutional Right

The court first analyzes "whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (quoting *Hope v. Pelzer*, 536 U.S. 730, 736 (2002)). Plaintiff alleges that Everett's actions violated her Fourteenth Amendment rights. Under the Fourteenth Amendment, pretrial detainees have a due process right to be protected from self-inflicted injuries, including suicide. *Greenway v. So. Health Partners, Inc.*, 827 F. App'x 952, 958 (11th Cir. 2020).

Everett first argues that, because Plaintiff did not *actually* succeed in taking her own life during her suicide attempt, there can be no constitutional violation. This argument misses the mark. It is well-established that a detainee does not actually have to succumb to her self-inflicted injuries to advance a Fourteenth Amendment claim; instead, a prisoner may succeed on a Fourteenth Amendment claim involving injuries short of death so long as she can show that an official "ha[d] subjective knowledge of a risk of serious harm and 'deliberately disregard[ed] a strong likelihood rather than a mere possibility that the self-infliction of harm [would] occur.'" *Garner on behalf of R.C. v. Jamerson*, 2023 WL 4927250, at *2 (11th Cir. Aug. 2, 2023) (quoting *Snow ex rel. Snow v. City of Citronelle, Ala.*, 420 F.3d 1262, 1268 (11th Cir. 2005)); *see also Schmeltz v. Monroe Cnty.*, 954 F.2d 1540 (11th Cir. 1992) (analyzing a Fourteenth Amendment claim under an unsuccessful suicide attempt).

"In a prisoner suicide case, to prevail under section 1983 for violation of substantiative rights, under the…[F]ourteenth [A]mendment, the plaintiff must show that the jail official displayed *deliberate indifference* to the prisoner's [attempted] taking of [her] own life." *Jackson v. West*, 787 F.3d 1345, 1353 (11th Cir. 2015) (quoting *Edwards v. Gilbert*, 867 F.2d 1271, 1274-75 (11th Cir. 1989)). "To establish a defendant's deliberate indifference, the plaintiff

8

[must] show that the defendant had (1) subjective knowledge of a risk of serious harm; (2) disregard[ed] … that risk; (3) by conduct that is more than mere negligence." *Snow*, 420 F.3d at 1268 (quoting *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005)). "Absent knowledge of a detainee's suicidal tendencies, … failure to prevent suicide has never been held to constitute deliberate indifference." *Greenway*, 827 F. App'x at 958 (internal citations omitted). But, "[w]here prison personnel directly responsible for inmate care have knowledge that an inmate has … threatened … suicide, their failure to take steps to prevent that inmate from committing suicide can amount to deliberate indifference." *Jamerson*, 2023 WL 4927250, at *2 (quoting *Greason v. Kemp*, 891 F.2d 829, 935-36 (11th Cir. 1990)).

Here, a reasonable juror could find that Everett had subjective knowledge that Plaintiff was suicidal and posed a risk of seriously harming herself if given the opportunity. To be sure, Everett was not one of the deputies assigned to Block A, nor had she ever met Plaintiff before she approached her cell on the afternoon of the suicide attempt. But, Everett admitted that she was made aware that Plaintiff was on suicide watch as soon as she walked up to her door and noticed her suicide smock. (Doc. # 35-3 at 10). Further, Everett understood that Plaintiff must have threatened to commit suicide for her to have been placed on suicide watch. (*Id.* at 23) ("I knew that at some point, she had to have told somebody she wanted to kill herself to be on suicide watch."). And, although Everett states that Plaintiff told her she injured her head by falling and hitting it on the toilet, other evidence in the Rule 56 record supports a finding that Everett knew Plaintiff had been banging her head against the wall of her cell. For example, Deputy Morgan remembers Everett saying that she was taking Plaintiff to get medical attention because "she was hitting her head on the wall." (Doc. # 35-4 at 16). This evidence, when viewed

in the light most favorable to Plaintiff, could allow a reasonable juror to find that Everett had subjective knowledge that Plaintiff posed a serious risk of attempting to harm herself.

A reasonable juror could similarly find that Everett disregarded the risk of Plaintiff attempting to harm herself when she unlocked her cell door from the control room – without a deputy being present in Block A. This allowed Plaintiff the opportunity to gain access to the second story balcony. A prison guard disregards a risk of suicide when she gives a known suicidal inmate access to something that could be used to do self-harm. *See Turner v. Phillips*, 547 F. Supp. 3d 1188, 1205 (N.D. Ala. 2021), *aff'd*, 2022 WL 458238 (11th Cir. 2022) (concluding officers were deliberately indifferent to the strong likelihood that an inmate would harm himself when they witnessed him attempt to hang himself and allowed him to be placed in an isolated cell with bedsheets that same day); *see also Cole v. Jones*, 2024 WL 1601210, at *7 (M.D. Ala. Mar. 13, 2024) (finding that an officer disregarded a risk by giving a suicidal inmate access to a razor).

That is precisely what occurred here. Officers at the Jefferson County Jail were trained to always accompany an inmate on suicide watch when she was out of her cell because "they're liable to hurt themselves if they're out in the day space…." (Doc. # 35-4 at 6). In fact, Everett testified that an inmate jumping off the second-floor balcony in the day space was an "obvious" suicide risk, and that, for this reason, inmates under suicide watch were typically assigned to cells on the bottom floor of A Block. (Doc. # 35-3 at 8). Further, in the time she had been working at the facility, Everett was aware of at least two other occasions where inmates had jumped off the top level of their units. (*Id.* at 24). Finally, Everett understood that she personally did not have to unlock Plaintiff's cell door from the control room, but instead could have used the intercom to call for the CRO to do it when she was safely stationed outside the cell door. (*Id.*

at 26). Despite this knowledge, Everett made the choice to remotely unlock the cell of an inmate she knew was on suicide watch and allow her access to an "obvious" suicide risk even though no deputies were near her (or even present in A Block).

Finally, a reasonable juror could find that Everett's conduct was not mere negligence, but instead rose to the level of deliberate indifference. The court acknowledges that deliberate indifference is an "exacting standard" that requires showing more than gross negligence. *See McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014) (internal citations omitted). "Under this circuit's precedent, in a prison suicide case, deliberate indifference requires that the defendant deliberately disregard *a strong likelihood* rather than a mere possibility that the self-infliction of harm will occur." *Cook*, 402 F. 3d 1115 (emphasis in original) (internal citations omitted). To be deliberately indifferent to a "strong likelihood" that the prisoner will commit suicide, "the official must be subjectively aware that the *combination* of the prisoner's suicidal tendencies and the feasibility of suicide in the context of the prisoner's surroundings creates a strong likelihood that the prisoner will commit suicide." *Gish v. Thomas*, 516 F.3d 952, 954 (11th Cir. 2008) (emphasis in original).

As discussed above, a reasonable juror could find that Everett was subjectively aware of Plaintiff's suicidal tendencies. She knew Plaintiff was on suicide watch. And, although Everett maintains that Plaintiff told her she injured herself by accidentally slipping and hitting her on her toilet, other evidence in the Rule 56 record supports a finding that Everett told officers that she was taking Plaintiff to get medical attention because "she was hitting her head on the wall." (Doc. # 35-4 at 16). Of course, a jury could accept as true Everett's testimony that she believed Plaintiff's head injuries were accidental and that she was not aware of the extent of Plaintiff's suicidal tendencies. But, at this stage of the case, the evidence must be viewed in the light most

11

favorable to Plaintiff – not Everett. In doing so, the court concludes that a reasonable juror could find that Everett was subjectively aware that Plaintiff was actively trying to harm herself mere moments before she unlocked her cell door. This is especially true when considering that Everett herself testified that inmates on suicide watch regularly bang their heads against their cell walls in efforts to harm themselves. (Doc. # 35-3 at 26).

Similarly, a reasonable juror could find that a suicide attempt was more than feasible if Plaintiff was left alone in A Block. "When analyzing the likelihood of suicide, courts look at the inmate's environment at the time the suicide or the attempt occurred and what tools [she] had that could make suicide likely." *Cole*, 2024 WL 1601210, at *5. In doing so, courts in this circuit have made clear that when an officer gives a suicidal inmate access to an obvious instrument of suicide, it creates a strong likelihood -- not just a mere possibility -- that a suicide attempt will follow. *Id.* (giving razors to a suicidal inmate created a strong likelihood of attempted suicide); *Allen v. Freeman*, 2013 WL 3356040, at *10 (S.D. Ga. 2013) (giving an inmate access to a bar and a sheet "strengthens the likelihood of suicide").

That is essentially what occurred here. Everett personally knew of two other instances where inmates had attempted to harm themselves by jumping from the second story of their cell block areas. (Doc. # 35-3 at 24). Further, Everett was aware that opening the door of a suicidal inmate's cell without supervision would give the inmate access to the second story landing, which she herself acknowledged was an "obvious suicide risk." (*Id.* at 8, 20-21). Despite the presence of this risk, a jury could conclude that Everett made a conscious -- and, as indicated by this record, unnecessary -- decision to open the door of Plaintiff's cell without any personnel in that vicinity. Indeed, both Deputy Morgan and Deputy Yunker testified that they would not have opened Plaintiff's door from the control room if they had been in Everett's shoes, but instead

would have requested the CRO unlock the cell while they were present in the block. *See* (Doc. # 35-4 at 12) ("I probably would just call, 'Roll Cell 11,' and I'll be standing somewhere in the block … where I could clearly see what [the inmate's] doing"); (Doc. # 35-6 at 11) (Deputy Yunker stating that standing by the cell of an inmate on suicide watch when it is unlocked is "common sense" because "you don't want them given the opportunity to be by themselves in [an] area especially that has a second floor").

In the court's view, there is little difference between allowing a suicidal inmate 23 seconds of access to a razor or a rope and Everett's conscious decision here to allow Plaintiff 23 seconds of unsupervised access to a staircase leading up to the second floor, which in her own words was an "obvious suicide risk." A reasonable juror could find the same. Therefore, Plaintiff has carried her burden in proving that Everett "deliberately disregard[ed] a 'strong likelihood rather than a mere possibility'" that harm would occur if she let Plaintiff out of her cell unsupervised, and she has satisfied the first prong of her burden of the qualified immunity analysis. *Snow*, 420 F.3d at 1268.

### 2.      Whether Everett Violated Clearly Established Law

Next, the court must examine whether Plaintiff has shown that Everett violated a statutory or constitutional right that that was clearly established when the violation occurred. A right is clearly established if it would be clear to a reasonable official that his or her conduct was unlawful. *Leslie v. Hancock Cty. Bd. of Educ.*, 720 F.3d 1338, 1345 (11th Cir. 2013). As the Eleventh Circuit recently summarized, there are three methods by which a right can be clearly established:

> Plaintiff[] can meet the clearly established requirement in one of three ways: (1) by pointing to a materially similar decision of the Supreme Court, of this Court, or of the supreme court of the state in which the case arose; (2) by establishing that "a broader, clearly established principle should control the novel facts" of the

13

> case; or (3) by convincing us that the case is one of those rare ones that "fits within the exception of conduct which so obviously violates th[e] constitution that prior case law is unnecessary." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005).
>
> Under the first and second of these methods, the plaintiff must rely on decisional law. *See Vineyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002) (noting that in the first method "we look at precedent that is tied to facts" while in the second method we look for "broad statements of principle in case law [that] are not tied to particularized facts" (emphasis omitted). Under the second and third methods, we look for "obvious clarity": a principle or provision so clear that, even without specific guidance from a decision involving materially similar facts, the unlawfulness of the officer's conduct is apparent. *Id.* at 1350-51 (nothing that "broad statements of principle in case law … can clearly establish law applicable in the future to different sets of detailed facts" and that the "words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances"); *see also Corbitt v. Vickers*, 929 F.3d 1304, 1312 (11th Cir. 2019); *Fish v. Brown*, 838 F.3d 1153, 1163 (11th Cir. 2016). In all three methods, the "'salient question' is whether the state of the law at the time of the incident gave [the officer] 'fair warning' that his conduct was unlawful." *Perez*, 809 F.3d at 1222 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 [] (2002)).

*Powell v. Snook*, 25 F.4th 912, 920-21 (11th Cir. 2022), *cert. denied*, 2022 WL 4652025 (2022). In this circuit, "only Supreme Court cases, Eleventh Circuit caselaw, and [state] Supreme Court caselaw can 'clearly establish' law…" *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 955 (11th Cir. 2003).

The Eleventh Circuit has made clear that "an officer's deliberate indifference to the risk of serious harm to a detainee is a violation of the Fourteenth Amendment." *Snow*, 420 F.3d at 1270 (citing *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)). For example, in *Turner v. Phillips*, the Eleventh Circuit analyzed whether the grant of qualified immunity was appropriate for two officers who knew that an inmate was suicidal and nonetheless gave him access to items that could be used to harm himself. 2022 WL 458238 (11th Cir. 2022). Specifically, the officers witnessed the inmate trying to attempt suicide by making a noose out of his clothes when in the shower. *Id.* at 3. However, instead of transferring the inmate to the

14

behavioral unit where he would be isolated from dangerous objects, the officers left him in a cell, unsupervised, with access to the bed sheets he used to hang himself. *Id.* The Eleventh Circuit found that the officers were not entitled to qualified immunity because "the officers were aware that Turner had a high risk of suicide and nonetheless kept him in a dorm where he would have dangerous items at his fingertips," despite there being a safer alternative: transferring him. *Id.* at 4.

The facts of *Turner* are materially similar to those here. Like in *Turner*, Everett knew that Plaintiff was suicidal. Further, as discussed above, a material dispute of fact exists concerning whether Everett was aware that Plaintiff had actively been trying to injure herself by banging her head against her wall. Therefore, a reasonable juror could find that, like the officers in *Turner*, Everett was aware that Plaintiff posed a high risk of suicide, knew that she was actively attempting to harm herself, and nonetheless allowed her unsupervised access to a dangerous item, despite there being a much safer alternative easily available. To be sure, the facts of the two cases have a minor (but indistinguishable) difference: whereas the officers in *Turner* left the suicidal inmate *in* a cell unsupervised with access to a dangerous object, Everett let Plaintiff *out* of her cell unsupervised with access to a dangerous jumping spot. But, precedent "need not be directly on point" to clearly establish a right; instead, it simply "must have placed the statutory or constitutional question beyond debate." *JW ex rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259 (11th Cir. 2018). Here, the Eleventh Circuit's decision in *Turner* placed beyond debate that an officer violates the Fourteenth Amendment when he or she gives an inmate who poses a high risk of suicide unsupervised access to something that the inmate could use to harm herself.

15

Against this backdrop, the court concludes that, on this record, the Fourteenth Amendment right in this context was clearly established at the time of the incident, and, as discussed above, a reasonable juror could find that Everett violated that right. Therefore, Plaintiff has carried her burden and Everett is not entitled to summary judgment on the basis of qualified immunity.[2]

### B.     Injunctive Relief

In addition to her qualified immunity argument, Everett also argues that she is entitled to summary judgment as to Plaintiff's request for injunctive relief because Plaintiff is no longer incarcerated at the Jefferson County Jail. (Doc. # 36 at 22). Plaintiff's request for injunctive relief consists of a single sentence in the Complaint seeking that the court "grant injunctive relief as necessary to effect this Court's judgment and prevent the recurrence of the harms alleged herein." (Doc. # 1 at 7).

"The general rule in [the Eleventh] [C]ircuit is that a transfer or a release of a prisoner from prison will moot that prisoner's claims for injunctive and declaratory relief." *Smith v. Allen*, 502 F.3d 1255, 1267 (11th Cir. 2007), *abrogated on other grounds by Sossamon v. Texas*, 563 U.S. 277 (2011). This general rule applies when the plaintiff is a prisoner seeking injunctive relief to remedy an allegedly unconstitutional condition existing at his or her place of confinement and names as a defendant an official who works at that institution. *See e.g.*, *McKinnon v. Talladega Cnty., Ala.*, 745 F.2d 1360, 1363 (11th Cir. 1984); *Wahl v. McIver*, 773 F.2d 1169, 1173-74 (11th Cir. 1985); *Robbins v. Robertson*, 782 F. App'x 794, 799-800 (11th Cir. 2019). This is so because an injunction directing a prison official to provide some sort of

---

[2] Everett also spends a portion of her brief arguing that, to the extent Plaintiff's Complaint alleges a claim for deliberate indifference to serious medical need, that claim is due to be dismissed because Everett is entitled to qualified immunity. (Doc. # 36 at 20-22). However, Plaintiff's response makes clear that she is not pursuing relief under this theory. (Doc. # 41 at 20 n.3). Therefore, this memorandum opinion need not address Everett's arguments for summary judgment on that claim.

relief to the released prisoner "would be an empty order" when the official no longer has the ability to provide any relief to the prisoner. *Robbins*, 782 F. App'x at 800. However, this general rule does not apply where a prisoner challenges allegedly unconstitutional conditions as they exist generally throughout a prison system. *Barnes v. Dunn*, 2022 WL 10264034, at *7 (N.D. Ala. 2022).

Everett argues that, to the extent Plaintiff's request for injunctive relief is related to Plaintiff's conditions at the Jefferson County Jail, the request should be denied as moot because Plaintiff has been released. (Doc. # 36 at 22-24). The court agrees. As the Complaint reads now, it is unclear just what manner of injunctive relief Plaintiff is seeking – or can seek. The Complaint merely requests injunctive relief "as necessary to effect this Court's judgment and prevent the recurrence of the harms alleged herein" without any specificity. (Doc. # 1 at 7). Because Plaintiff is no longer in jail, any injunctive relief directing Everett to provide some sort of relief to her would be an "empty order." *Robbins*, 782 F. App'x at 800. As a result, Everett is entitled to summary judgment on this claim to the extent Plaintiff is requesting injunctive relief related to her conditions at the Jefferson County Jail. Having said that, if the court has misunderstood Plaintiff's request for injunctive relief unrelated to her confinement at the jail, she may clarify her contention and raise it with the court.

Therefore, Everett's motion for summary judgment on this issue is granted and Plaintiff's request for injunctive relief is due to be denied without prejudice.

## IV.   Conclusion

For the reasons discussed above, Everett's Motion for Summary Judgment (Doc. # 34) is due to be granted in part and denied in part. An order consistent with this memorandum opinion will be entered contemporaneously.

**DONE** and **ORDERED** this June 17, 2024.

_____
**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE